

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD84845 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | August 22, 2023 |
| JEFFERY E. MORGAN, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Charles H. McKenzie, Judge**

**Before Division One:** Gary D. Witt, Chief Judge, Presiding, and
Mark D. Pfeiffer and Anthony Rex Gabbert, Judges

Mr. Jeffery Morgan ("Morgan") appeals from the judgment entered by the Circuit

Court of Jackson County, Missouri ("trial court"), following a jury trial in which he was

found guilty of the felonies of unlawful use of a weapon, armed criminal action, and

unlawful possession of a firearm. We affirm.

## Facts and Procedural History[1]

Morgan and Victim had a "tumultuous" relationship, which included incidents of abuse, since their marriage in 2015. On June 5, 2015, Morgan became enraged when a male friend texted Victim to inquire how she was doing. Morgan proceeded to beat Victim with a belt. In order to document her injuries, Victim took pictures that showed bruises covering her body. Victim also sustained a vaginal injury when the belt buckle on the belt Morgan was swinging hit Victim between her legs and sliced her vagina. On July 19, 2015, Morgan broke a bathroom window to enter Victim's locked house and tried to drag Victim out of the closet in which she was hiding. A neighbor called the police to report an intruder climbing in the window of Victim's house, and the police responded. On December 11, 2016, Morgan and Victim argued over Victim's phone. Morgan took the phone and refused to give it back. When Victim tried to get it back, Morgan hit her in the face with his fist. On September 3, 2017, Victim accidently caused several of Morgan's laptops to fall off a table. Morgan became upset and choked Victim. After Morgan left, Victim called the police, and Morgan was arrested. Morgan was not prosecuted for any of these incidents.

On June 29, 2019, Morgan had not come home or answered Victim's calls by 3:00 a.m., so she went for a drive in Morgan's Ford F-150 truck to clear her head. On her drive, she saw Morgan at a 7-Eleven convenience store. She pulled up behind his

---

[1] "On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Bowman*, 663 S.W.3d 916, 918 n.1 (Mo. App. W.D. 2023) (internal quotation marks omitted).

motorcycle. When he approached her vehicle, she asked him where he had been. He said he had been with a friend, came to get gas at 7-Eleven, and was on his way home. Victim thought Morgan had a "nonchalant attitude, kind of like . . . a f[*&]k you type attitude." When he told her that he was going back in the store, she "looked at his motorcycle and I wanted to hit it and I hit it. . . . I knew he loved that motorcycle more than he loved me, so I hit it." Her truck got stuck after running over the motorcycle, so she reversed the truck to back over the motorcycle; she then hit the gas as hard as she could to leave the parking lot. She heard gunshots, and bullets shattered the driver's side window and hit the body of the truck. When Victim was about a block away, the truck stalled, so she ran and hid in someone's yard and called the police.

A Kansas City Police Department patrol officer was dispatched to the 7-Eleven at about 4:00 a.m. and recovered twelve shell casings, all 9x19 millimeter fitting in a nine-millimeter handgun. A Kansas City Police Department detective executed a search warrant at Morgan and Victim's residence. He found one live nine-millimeter round, seventy-nine other live rounds, and boxes for a nine-millimeter Taurus handgun and a .45 caliber Glock 30. The detective also found a black and chrome Harley-Davidson motorcycle with damage to the right side. At the tow lot, the detective inspected the Ford F-150 truck Victim was driving that night and found two bullet holes in it.

On August 23, 2019, Morgan was charged with the class B felony of unlawful use of a weapon for knowingly discharging a firearm at a motor vehicle; the unclassified felony of armed criminal action for committing the felony of unlawful use of a weapon with a deadly weapon; and the class D felony of unlawful possession of a firearm for

3

knowingly possessing a 9 mm handgun after previously being convicted of the felony of trafficking in drugs/attempted trafficking in drugs in the second degree. Subsequently, the trial court granted the State leave to file a first amended information in lieu of indictment, charging Morgan as a prior and persistent offender.

On October 22, 2019, the State filed a motion to deny Morgan's phone, mail, and visitation privileges. The trial court held a hearing on the motion. The trial court sustained the motion in part, relating to phone and mail privileges, and denied the motion in part, permitting visitation.

On November 5, 2020, Morgan's counsel moved for leave of court to withdraw as his attorney of record. After a hearing, the trial court denied the motion on January 11, 2021.

On June 23, 2021, the State moved the trial court to admit evidence of prior bad acts committed by Morgan against Victim, arguing that the evidence established Morgan's intent, motive, common scheme, absence of mistake or accident, and identity; related to Morgan's actions leading up to the charged offenses; and provided the jury with a complete picture of the incident, putting both Morgan's conduct and Victim's reactions into context. The trial court sustained the State's motion.

The trial court found beyond a reasonable doubt that Morgan was a prior and persistent offender and conducted a jury trial on July 6-8, 2021. The State's evidence included the testimony of Victim, the patrol officer, and the detective. Morgan moved for acquittal at the conclusion of the State's evidence and at the close of all evidence. The trial court denied the motions. Morgan also moved for a directed verdict, which the

trial court denied.  Morgan testified on his own behalf, admitting that he shot at Victim's truck twelve times but claiming that he fired the weapon in self-defense.

The jury found Morgan guilty beyond a reasonable doubt of the offenses as charged.  The trial court entered its judgment on the jury's verdict on September 17, 2021, and sentenced Morgan to the following terms of imprisonment:  fifteen years on the unlawful use of a weapon charge, three years on the armed criminal action charge, and three years on the unlawful possession of a firearm charge, with all sentences to run concurrently.  Morgan filed a motion for new trial, challenging, in pertinent part, the trial court's admission of Morgan's prior bad acts.  The trial court denied the motion.

Morgan timely appealed.  Additional facts will be addressed in our analysis of Morgan's claims on appeal.

## Points on Appeal

Morgan asserts three points on appeal.  In Morgan's first two points, he contends that the trial court abused its discretion in overruling his objection to the admission of testimonial prior-bad-acts evidence (Point I) and to the admission of photographic prior-bad-acts evidence (Point II).  Because the points are related, we will address them together.  In Morgan's third point, he argues that the trial court erred in denying him mail and telephone privileges after he asserted his right to self-representation.

## Standard of Review

"We review the trial court's decision to admit or exclude evidence at trial for abuse of discretion."  *State v. Bowman*, 663 S.W.3d 916, 923 (Mo. App. W.D. 2023).  "A trial court abuses its discretion when its ruling admitting or excluding evidence is clearly

against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id*. (internal quotation marks omitted). "Evidentiary error alone does not require reversal; the appellant must have suffered prejudice as a result of the admission of the evidence." *Id*. "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *Id*. (internal quotation marks omitted).

Because Morgan's claim of error concerning the trial court's denial of mail and telephone privileges was not included in his motion for new trial, it is not preserved for our review. *State v. Hilbert*, 663 S.W.3d 462, 465 (Mo. banc 2023). However, Rule 30.20 gives appellate courts discretion to review "plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."[2] Plain error review is a two-step process:

> The first step requires a determination of whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear. If plain error is found, the court then must proceed to the second step and determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.

*Hilbert*, 663 S.W.3d at 465 (quoting *State v. Minor*, 648 S.W.3d 721, 731 (Mo. banc 2022)).

---

[2] All rule references are to I MISSOURI COURT RULES – STATE 2023.

## Analysis

## Points I and II

In Morgan's first and second points, he contends that the trial court abused its discretion in overruling his objection to the admission of prior-bad-acts evidence because the prior bad acts were neither logically nor legally relevant to the issues before the jury and the prejudicial effect of the prior-bad-acts evidence outweighed its probative value.

Prior to trial, the State filed a motion to admit evidence of prior bad acts committed by Morgan against Victim, arguing that the evidence established Morgan's continuing animus toward Victim, which was especially probative in establishing motive and intent. The State further argued that Morgan's prior abusive behavior directed at Victim tended to put Morgan's behavior in the proper context, which allowed the State to present a complete and coherent picture of the events that led up to the current charges against Morgan. Morgan countered that the State's use of prior-bad-acts evidence was for propensity purposes and would unduly prejudice the jury. The trial court sustained the State's motion.

At trial, the State questioned Victim about her relationship with Morgan, which she described as "[t]umultuous." When the State asked Victim whether there were incidents where Morgan abused her prior to the charged incident, Morgan renewed his objection to admission of the prior-bad-acts testimony. The trial court overruled the objection, and Victim testified that Morgan had abused her four times in the past: when he struck her with a belt, when he tried to pull her out of a closet, when he struck her in the face after taking her phone, and when he choked her after they argued. The State then

asked Victim to identify seven photographs that she took of her injuries after Morgan beat her with a belt. The trial court overruled Morgan's objection to admissibility, and the photographs were published to the jury.

Generally, evidence of prior uncharged crimes, wrongs, or acts is excluded in order to prevent the jury from "us[ing] the evidence of the uncharged crime to infer the defendant has a general criminal disposition, a bad character, or propensity or proclivity to commit the type of crime charged, and in turn, basing a finding of guilt on the uncharged crime." *State v. Jackson*, 636 S.W.3d 908, 920 (Mo. App. W.D. 2021) (internal quotation marks omitted). However, such evidence may be admissible if otherwise logically and legally relevant. *Id.* at 921.

"Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* "Evidence of uncharged crimes, wrongs, or acts may be logically relevant to establish the defendant's motive, intent, absence of mistake or accident, identity, or common scheme; a complete and coherent picture of the circumstances and events surrounding the charged crime; or any other material fact." *Id.* (internal quotation marks omitted). "[L]ogical relevance is a very low-level test that is easily met." *Id.* (internal quotation marks omitted).

Particularly in cases involving an alleged assault of a victim by the defendant,[3] Missouri courts have held that "prior misconduct by the defendant toward the victim is

---

[3] Morgan argues that the exceptions to the exclusion of prior-bad-acts evidence for prior acts of domestic abuse in assault, murder, or attempted murder cases do not support the inclusion of the prior-bad-acts evidence in this case because Morgan was charged with unlawful use of a weapon for firing at a motor vehicle, armed criminal action, and

8

logically relevant to show motive, intent, or absence of mistake or accident." *State v. Tolliver*, 101 S.W.3d 313, 315 (Mo. App. E.D. 2003) (citing *State v. Danikas*, 11 S.W.3d 782, 789-90 (Mo. App. W.D. 1999) (collecting cases)). "Such evidence is only admissible for those purposes, however, if the defendant puts motive, intent, mistake or accident at issue in the case." *Id.* (citing *State v. Conley*, 873 S.W.2d 233, 237 (Mo. banc 1994)). "Raising self-defense to an assault charge puts motive and intent squarely at issue, thereby making evidence of prior assaults against the same victim relevant." *Id.*; *see also State v. Arney*, 731 S.W.2d 36, 41 (Mo. App. S.D. 1987) ("[W]here a defendant asserts self-defense, in general, prior criminal acts of violence between the parties is held admissible.").

Morgan put motive and intent squarely at issue in this case by claiming that he only discharged his weapon at the truck Victim was driving in self-defense because the truck was headed back in his direction and he felt he was in danger. Morgan testified that

---

unlawful possession of a firearm, and not with assault or domestic assault. But, the prior-bad-acts "exceptions" referred to in these cases (motive, intent, absence of mistake or accident, common scheme, identity) are not limited to assault or murder cases. *See State v. Arney*, 731 S.W.2d 36, 40 (Mo. App. S.D. 1987) (itemizing cases applying these evidentiary exceptions to cases of burglary, drug possession, and embezzlement). Instead, the focus of cases applying such evidentiary exceptions relates to whether the prior acts of the defendant bear logical and legal relevance regarding defendant's claims, relating to, for example, the "motive" or "intent" with regard to the actions of the defendant in the current criminal case for which he has been charged. Here, Morgan put motive and intent at issue by claiming that he acted in self-defense. *See State v. Morgan*, 137 S.W.3d 477, 480 (Mo. App. S.D. 2004) ("When motive or intent is at issue in an assault case (as it is here), prior misconduct by the defendant is logically relevant to demonstrate such motive or intent. . . . [P]rior incidents of misconduct further showed Defendant's animosity toward Victim and his willingness to commit violence toward her.").

9

when Victim left the 7-Eleven parking lot, she hit water, lost control of the truck, and spun out. Morgan testified that:

> the truck was pointed dead at me coming back towards the parking lot. . . . And as she was coming up to the entrance on the side of 7-Eleven, the truck started veering like she was coming back in the entrance. I pulled my weapon at that time. And when I fired, she yanked the wheel and ducked down and hit the gas.

According to Morgan, Victim began to leave after the second or third shot, but he continued to shoot, shooting a total of twelve times. Morgan testified that he felt he was in danger and using his weapon was reasonable "[b]ecause I'm a 185-pound man up against a 4,000 pound truck." "[E]vidence that [Morgan] committed numerous assaults on [Victim] in the past was probative of whether [he] acted in self-defense during the charged incident[ ] or in fact intended to cause [Victim] serious physical injury." *Tolliver*, 101 S.W.3d at 316.

"If evidence of uncharged crimes, wrongs, or acts tends to prove something other than the defendant's propensity to commit the crimes for which he is charged, then the question becomes whether the evidence is legally relevant." *Jackson*, 636 S.W.3d at 921. "Evidence is legally relevant if its probative value outweighs its costs—'unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness.'" *Id*. (quoting *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002)). Victim's testimony about Morgan's prior uncharged acts of abuse put Morgan and Victim's relationship in context, showed Morgan's animus toward Victim, provided a potential explanation for Victim's intentional action in hitting Morgan's motorcycle and Morgan's lethal response in firing his gun at the vehicle she was driving, and gave a

10

"complete and coherent picture of the events that transpired" on June 29, 2019. *See State v. Primm*, 347 S.W.3d 66, 71 (Mo. banc 2011) ("[E]vidence of uncharged crimes may be admissible to provide the trier-of-fact with a 'complete and coherent picture of the events that transpired.'" (quoting *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994))).

Our "standard of review affords great deference to the trial court's assessment of whether evidence is legally relevant." *State v. Kelly*, 604 S.W.3d 672, 680 (Mo. App. W.D. 2020) (quoting *State v. Clover*, 924 S.W.2d 853, 856 (Mo. banc 1996)). The trial court is in a better position to assess the possible prejudicial effect of evidence against the probative value of the evidence, a determination that necessarily requires the trial court "to consider and understand the circumstances within the trial." *Id.* (quoting *Clover*, 924 S.W.2d at 856).

The trial court could reasonably have determined that the probative value of the evidence that Morgan committed numerous assaults on Victim in the past was not outweighed by any prejudicial effect it may have had. The trial court did not abuse its discretion in admitting the prior-bad-acts evidence.

Points I and II are denied.

**Point III**

In Morgan's third point, he argues that the trial court erred in denying him mail and telephone privileges after he asserted his right to self-representation. He contends that the trial court's ruling coerced his waiver of the right to self-representation. Because this claim of error was not included in Morgan's motion for new trial, our review is for plain error.

11

On October 18, 2019, the trial court scheduled Morgan's jury trial for July 13, 2020. On October 22, 2019, the State filed a motion to deny Morgan's phone, mail, and visitation privileges. The trial court held a hearing on the motion on November 8, 2019. The prosecutor informed the court that she had "voluminous" letters and evidence of telephone calls made by Morgan to Victim during the pendency of the action. According to the prosecutor, when she drafted the motion, Morgan had placed 177 calls to Victim's cell phone and 232 calls to her home phone; and when the prosecutor checked on the day of the hearing, she found that the last phone call Morgan made to Victim was on October 29, about a week before the hearing.

The prosecutor also informed the court that Morgan continued to contact Victim indirectly by having his nephew or daughter three-way call the Victim so Victim would not know it was Morgan on the phone. Morgan also asked his nephew to send Victim text messages. The prosecutor read highlights from sixteen letters Morgan sent Victim, asking Victim to not come to court and to not participate in the prosecution, which dissuasion the prosecutor described as "victim tampering." The prosecutor told the court that Morgan called Victim's son and said, "Man, I need you to do me a favor because you got—make sure she does not show." Morgan also called his nephew almost every day asking him to go over to Victim's house to check up on her and see what she was doing, and to tell Morgan what cars were parked there.

The prosecutor advised the trial court that Victim was "very afraid" of the communication that Morgan had with her and of Morgan's nephew driving by her house. Victim was very fearful that Morgan would influence other people to do something to

12

her. The prosecutor advised the court that even though defense counsel told Morgan not to call Victim any more, Morgan still made fourteen phone calls to Victim since the last court date, and he told his nephew to keep checking up on Victim and updating him. Based upon Morgan's actions, the State asked the trial court to deny Morgan all privileges for the phone, mail, and visitation other than to consult with his attorney on his defense.

Defense counsel argued that the majority of Morgan's calls to Victim had to do with their marital situation. Counsel agreed that Morgan should not be writing Victim letters but said that Morgan's conversations with family members and friends were "absolutely necessary for him to obtain assistance in supporting his defense, financially or otherwise."

The trial court sustained the motion in part, relating to phone and mail privileges, and denied the motion in part, permitting visitation. The trial court reasoned: "I think there has to be an analysis of this, not only as it relates to the rights of the defendant and communication, but also balancing with that the right to a fair administration of justice and also the right of people being free of any unwanted communication."

On July 10, 2020, the trial was rescheduled. Defense counsel filed a motion for leave of court to withdraw as attorney of record on November 5, 2020. The trial court held a hearing on the motion on December 2, 2020, at which Morgan confirmed that he

wanted to represent himself. The trial court stated it would prepare a waiver of counsel form for Morgan to review before holding a *Faretta*[4] hearing.

On January 4, 2021, Morgan filed a motion requesting that the trial court reinstate all of his privileges. The trial court held a hearing on that motion on January 11, 2021. Victim testified that, despite the trial court's order denying Morgan mail privileges, she had continued to receive written correspondence from Morgan. In the correspondence, Morgan asked Victim to not testify against him. The trial court found that Morgan wrote the letters to Victim in violation of the trial court's previous order because the trial court ruled that Morgan "didn't have mail privileges other than with his lawyer and he's obviously getting mail to [Victim]," telling her to not testify and to not go to depositions. The trial court explained:

> And so, Mr. Morgan, I'm not going to change the privileges. That makes it a situation where you will not have the ability to use a telephone and you will not have the capability, as far as I'm concerned, to write letters. You can still conduct discovery, I'll still let you take depositions if that's what you wanted to do.
>
> But anyway, Mr. Morgan, you would always be able to file motions and send correspondence to the Court, but I'm not going to change the phone privileges, I'm not going to change that you—the issue of writing letters because I find that it appears to be an issue where you're trying to persuade one of the State's witnesses from testifying and cooperating with the State.
>
> So with that in mind, do you still want to represent yourself knowing that you don't have phone privileges, and I find it other than getting documents to us, that you want to proceed as your own lawyer?
>
> Mr. Morgan: No, I find that it is unable to do [sic] without my privileges.

---

[4] *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

> The Court: I understand. So do you want [defense counsel] to continue to represent you at this time?
>
> Mr. Morgan: Yes.

Tr. vol. 4, 24-25.[5] Morgan was represented by counsel at his jury trial conducted on July 6-8, 2021.

"A trial court may use its inherent powers and impose sanctions when parties act in bad faith." *Hale v. Cottrell, Inc.*, 456 S.W.3d 481, 488 (Mo. App. W.D. 2014). "Trial courts are encouraged to use them sparingly, wisely, temperately, and with judicial self-restraint." *Id.* (internal quotation marks omitted). "[S]anctions imposed under the court's inherent powers should be limited to situations in which it is reasonably necessary to preserve the court's existence and protect it in the orderly administration of its business." *Id.* (internal quotation marks omitted). "While there is no concrete definition of 'bad faith,' it embraces something more than bad judgment or negligence." *Shuttlewagon, Inc. v. Higgins*, 628 S.W.3d 185, 200 (Mo. App. W.D. 2021) (internal quotation marks omitted). "Bad faith embraces actual intent to mislead or deceive another, or imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Id.* (internal quotation marks omitted).

The trial court restricted Morgan's privileges to write letters and make phone calls after Morgan had communicated inappropriately with Victim by placing hundreds of

---

[5] As the foregoing colloquy demonstrates, the trial court did not deny Morgan's request to represent himself; rather, Morgan voluntarily *withdrew* his request for self-representation.

15

calls to Victim's cell phone and to her home phone and by sending numerous letters to Victim, asking Victim to not come to court and to not participate in the prosecution, which dissuasion the prosecutor described as "victim tampering." Morgan claims that the trial court's refusal to restore his privileges to write letters and make phone calls effectively coerced his waiver of the right to self-representation by depriving him of the ability to perform the basic tasks necessary to investigate the case and mount an effective defense. The record refutes Morgan's claim. The trial court explained to Morgan that he was permitted to conduct discovery, take depositions, file motions, and send correspondence to the court but was prohibited from telephoning and writing letters in order to dissuade one of the State's witnesses from testifying and cooperating with the State. The trial court did not plainly err by restricting Morgan's phone and letter-writing privileges.

**Conclusion**

The trial court's judgment is affirmed.

_____
Mark D. Pfeiffer, Judge

Gary D. Witt, Chief Judge, and Anthony Rex Gabbert, Judge, concur.